### THE SENATOR PENROSE. THE READING. THE PEERLESS.

(District Court, E. D. Pennsylvania. January 19, 1921.)

#### No. 65.

**Collision ⬦95(4)—Ferryboat held at fault for collision with tow showing proper lights.**

On libel and cross-libel for damages resulting from a collision between a ferryboat and a barge in tow of a tug which were on substantially meeting courses, the tow *held* to have displayed the proper lights, and the ferry to have been solely at fault for assuming the course of the tow to be different from what it actually was, and therefore not paying attention to the lights, which would have shown the falsity of the assumption.

In Admiralty. Cross-libels by the Gloucester Ferry Company, owner of the steam ferryboat Peerless, against the steam tug Senator Penrose and the lighter Reading, and by the Baltimore & Philadelphia Steamboat Company, owner of the steam tug Senator Penrose and of the lighter Reading, against the steam ferryboat Peerless. On trial hearing on libel, cross-libel, and proofs. Libel on behalf of the ferryboat dismissed, and cross-libel sustained.

Lewis, Adler & Laws, of Philadelphia, Pa., for plaintiff.
Howard H. Yocum, of Philadelphia, Pa., for defendant.

DICKINSON, District Judge. This cause is one in which each of the parties is asserting a cause of action against the other arising out of a collision. The only facts of which any one can be sure is that there was a collision, and that each puts the blame upon the other. Even every minor evidentiary fact is in dispute, except a very few, and these afford us little, if any, real help in reaching a conclusion. One of these minor facts with respect to which we are able to make a finding is that the tug Senator Penrose, with the barge Reading in tow, was proceeding down the Delaware river on an ebb tide not long

after slack high water, something after 6 o'clock on the morning of October 9, 1918. The tug and barge were made fast alongside of each other by bow and stern lines and by a spring line. The tug was on the starboard side. The ferryboat Peerless was on one of its regular trips from Gloucester to the South Street slip on the Philadelphia side of the river. The ferryboat had crossed the river to the Pennsylvania side, and under the weight of the evidence had straightened its course following its purpose to proceed up the river on the western side of the channel. The tug, with its tow, was about in mid-channel, or a little to the eastward of mid-channel.

The evidence would seem to warrant the negative finding that it could not be found that either was not displaying the regulation lights. The testimony on behalf of the ferryboats is that, when the vessels had approached to within signaling distance of each other (assuming that they were proceeding on parallel courses in reverse), the lines of these courses were about 175 feet apart, with the ferryboat to the westward. The testimony of those aboard the tug and barge would indicate that these lines of approach were nearer dead on, but the finding is justified that the ferryboat was, if anything, somewhat to the westward.

Another minor fact upon which the parties are in agreement is that the tug first gave a passing signal of one whistle indicating that the boats should pass port to port, and that this signal was promptly answered by a like whistle from the ferryboat, indicating that the tug's signal was understood and would be observed.

The conclusion, which is also undisputed, follows that the helm of each should have been ported, changing the course of the tow to the westward and the ferryboat to the eastward. Each avers and vigorously insists that it complied with the requirement to port helms.

The testimony on behalf of the ferryboat is that the course of the latter was shifted five points to the eastward. This was almost a right angle turn.

The testimony on behalf of the tow is that its course was changed to the westward one-half point.

There is no agreement upon another fact except the fact of collision; the fact that the port side of the ferryboat collided with the port forward corner of the barge; that the barge as a result of the collision dumped its cargo load; and that the load thus dumped was afterwards located by a survey. There is no agreement, but, on the contrary, a dispute over the further fact of whether the dump locates the place of the collision. The ferryboat insists that it does, and the tow insists that it does not, because of the fact that the barge was cast or broken loose from the tug and swung completely around and far to the westward before the dump went overboard.

There is one fact which, if it appeared with any degree of certainty, would supply the key to unlock the truth of this case and furnish a solution of what otherwise is almost a riddle. That fact is the distance up and down the river which separated the two vessels at the time the signal was given. Each of the parties has a theory of how the collision came to result. Each theory fits the facts which each

side presents, but each theory is wholly demolished by the fact situation presented by the opposing side. We are in consequence confronted with the dilemma in which we are thus placed. The dilemma is the difficulty of deciding whether the theory was made to fit the facts or the facts have been made to fit the theory. The theory of the ferryboat is that at once upon the exchange of signals the course of the ferryboat was swung five points to the eastward. The rate of speed (over the bottom) of the boats was about the same. Neither boat changed its speed. The collision occurred. It follows that what we will call the lateral distance between the vessels must have been one-half the longitudinal distance. The former distance (by the ferry boat estimate) was 660 feet, and the latter 1,320 feet. The barge estimate of the latter distance, however, is 2,640 feet, and, if this is correct, the ferryboat would have cleared the barge by a wide, margin of clearance. The theory of the tow is, of course, open to the same query whether the figures of real distances fit the theories or have been made to fit.

In consequence, the theories of the parties afford us little aid, and we must look elsewhere for light. From the viewpoint of the ferryboat the vessels should have passed starboard to starboard. The signal from the tow called for a port to port passing. The ferryboat was within its rights in exercising its privilege to accept this signal, or, if the maneuver was not a safe one, to cross signals. It accepted the signal, and is not open to criticism for so doing, but the acceptance carries the finding that there was room and time to get to eastward of the tow. Its theory is that it turned abruptly to starboard, but that the tow kept its course straight down the river. If the facts support the theory, the collision was in part, if not wholly, the fault of the tow. If the facts were as stated, however, the tow would have showed its green light. This plainly spelled a danger of which the ferryboat was wholly unaware. Why was the danger not apparent? The necessity to explain this was appreciated and accepted. The explanation given is that not only was the tow not showing the regulation sailing lights, but was showing deceptive and misleading lights in that it displayed no green light at all and displayed a red light which showed and was visible all around the horizon.

We have already made the finding in a negative form, which we now make affirmatively, that the tow was displaying the regulation sailing lights. We further find there was no bastard red light displayed on the barge. We come back then to the question why did the ferryboat not see the green light?

The confession follows that it was due wholly to inattention. Why did they not see the green light, and why do they testify that they saw a red light? The answer, we think, is easily reached. We are far from entertaining the thought of any willful misstatement of facts. The ferryboat helmsmen thought the tow was going in to one of the wharves. If she was thus headed, she would show a red light. Hence she must have showed it, and those aboard the ferryboat must have seen it. It became afterwards clear that the tow was not bound for the wharves, but was continuing down the river. The position

of the vessels was such that at the time of the exchange of signals the red light (if of the regulation kind) could not have been seen. Hence it could not have been of the regulation kind and must have been a lantern lashed to a stay or suspended by a halyard so as to show red in all directions. As such must have been the case, of course, such was the fact. With the finding of the fact to be otherwise the whole theory falls.

The opposing theory is that the ferryboat assumed the tow was going into the wharves. The tow was a half mile or more ahead. It had less than 150 feet to go to get across the course of the ferry-boat. The latter would, in consequence, pass astern of the tow with-out more being done, and there was no need for the ferryboat to change its course at once, and probably would not need to change at any time. The ferryboat accordingly held its course for some time until the vessels had approached within a longitudinal distance of about 300 feet of each other, when suddenly the helmsman of the ferryboat discovered his error, and at once pushed his helm to port in the hope he could get across the bow of the tow in time to avoid a collision. The fact that the helm was put hard aport (which we learn from the testimony on behalf of the ferryboat) bears out this theory of the collision. If, as the ferryboat had supposed, the tow had turned sharply to the westward, as the lateral distance was not more than 175 feet (and according to the witnesses for the tow much less than this distance), what occasion was there for the ferryboat to turn as sharply as five points to the eastward, when the longitudinal distance between the boats was from a quarter to half a mile? If, on the other hand, the shift of helm was not made until the boats were within 300 feet of each, there was every reason to push the helm hard over at once.

The very capable and experienced proctor for the ferryboat frankly admits that the weight of the evidence on the subject of the red light is against his clients. This convicts them of depending and acting, not upon what the sailing lights disclosed to them was the course of the tow, but upon their assumption of what the course was, and the collision was brought about by their assumption turning out to be wrong. They failed to observe the sailing lights of the tow. If this was due to the fact that the lights did not show when the signals were ex-changed, the distance between the vessels was under the conditions of that night over one-half mile. In that case their theory entirely falls.

There is a further obstacle to an acceptance of the theory on behalf of the ferryboat. Not only does the red lantern fact feature of the case fail them, but they are convicted of neglect to observe and be guided by the lights displayed by the tow. Just how far a green light could be seen under the conditions of that night cannot be found, but there is a concurrence of testimony that if it could not be seen the vessel displaying it was more than a half mile distant, and there is a further concurrence of testimony that it could be seen to the distance of a half mile. According to the helmsman of the ferryboat, they did not see the green light when the vessels were within one-quarter of a mile of each other, and according to the testimony of those

.aboard the tow the inference would be justified that the sailing lights of the tow were not observed by those aboard the ferryboat until the vessels were within about 300 feet of each other.

The only explanation the navigators of the ferryboat give of their failure to see these lights was that they did not look for them nor pay any attention to them. This convicts them of negligence at the outstart. It also makes it clear that they maneuvered their vessel on what they assumed to be the situation ahead of them, and were so sure that this assumption was right that they did not take the trouble to confirm it, although confirmation was in easy reach.

The conclusion reached is that the libel on behalf of the ferryboat should be dismissed, and the cross-libel sustained.

To give definiteness of date for any appellate use which may be made of it to the decree entered, no decree is now made, but the proctors in the cause have leave to submit a decree in accordance therewith.